01
02
03
04
05
06
07
08

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

09

QWEST CORPORATION,

10                    Plaintiff,

11       v.

12  WASHINGTON STATE UTILITIES AND
    TRANSPORTATION COMMISSION, et
13  al.,

14                    Defendants.

)
)   Case No. C06-956-JPD
)
)
)
)   ORDER REVERSING AND REMANDING
)   THE FINAL DECISIONS OF THE WUTC
)
)
)
)

15 _____

16              I.  INTRODUCTION AND SUMMARY CONCLUSION

17          The issue presented in this case is whether the Final Orders of the Washington State

Utilities and Transportation Commission ("WUTC"), requiring Qwest Corporation ("Qwest")
18
to pay intercarrier compensation to Pac-West Telecomm, Inc. ("Pac-West") and Level 3
19
Communications, LLC ("Level 3") for dial-up "Virtual NXX" internet service provider
20
("ISP") traffic, violate the terms of the *ISP Remand Order* issued by the Federal
21
Communications Commission ("FCC") in 2001. *Local Competition Provisions in the*
22
*Telecommunications Act of 1996* ("*ISP Remand Order*"), 16 F.C.C.R. 9151, 2001 WL
23
455869 (April 27, 2001).  The Court concludes that the WUTC violated federal law by
24
interpreting the *ISP Remand Order* to include ISP-bound VNXX calls terminating outside a
25
local calling area.  Accordingly, the decision of the WUTC is REVERSED and REMANDED
26
for further proceedings not inconsistent with this Order.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 1

01

02                          II.   FACTS AND PROCEDURAL BACKGROUND

03          A.      The Regulatory Network

04          Until 1996, local telephone service was furnished primarily by a single company with

05  an exclusive franchise to serve an authorized territory within a given state.  The

06  Telecommunications Act of 1996 ("the Act"), Pub. L. No. 104-104, 110 Stat. 56 (codified as

07  amended in scattered sections of 47 U.S.C.), replaced this system, and was enacted "to

08  promote competition and reduce regulation in order to secure lower prices and higher quality

09  services for American telecommunications consumers and encourage the rapid development of

10  new telecommunications technology."  *Id.* pmbl.; *see also generally Verizon Md. Inc. v.*

11  *Public Serv. Comm'n*, 535 U.S. 635, 638 (2002).  To achieve these goals, the Act requires

12  the former local telephone monopolies, called incumbent local exchange carriers ("ILECs"), to

13  allow competitive local exchange carriers ("CLECs") to interconnect with their networks.

14  *Global NAPs, Inc. v. Verizon New England, Inc.* ("*Global NAPs I*"), 444 F.3d 59, 62 (1st Cir.

15  2006) (citing 47 U.S.C. § 251(c)(2)).  This "interconnection" permits customers of one local

16  exchange carrier ("LEC") to make calls to, and receive calls from, customers of other LECs.

17  *Id.* (citing *Global NAPs, Inc. v. Massachusetts Dep't of Telecomms. & Energy*, 427 F.3d 34

18  (1st Cir. 2005)).  It is a calling relay largely irrelevant to the customer, but vital to the

19  participating telecommunications carriers.

20          To ensure that each LEC is fairly compensated for such calls, the Act requires

21  interconnected LECs "to establish reciprocal compensation arrangements for the transport and

22  termination of telecommunications."  47 U.S.C. § 251(b)(5).  Interconnection agreements are

23  thus the vehicles chosen by Congress to implement the duties imposed by § 251.  Under these

24  agreements, when a customer of one LEC places a local, non-toll call to the customer of a

25  competing LEC, the originating LEC must compensate the terminating LEC for completing

26  that call.  *See* 47 C.F.R. § 51.701.  The FCC, as the agency that regulates compensation

01  schemes among telecommunications carriers that collaborate to complete a call, initially

02  determined that § 251(b)(5)'s reciprocal compensation obligations "should apply only to

03  traffic that originates and terminates within a local calling area," as defined by state regulatory

04  authorities. *Local Competition Provisions in the Telecommunications Act of 1996* ("*Local*

05  *Competition Order*"), 11 F.C.C.R. 15499, 16013, ¶ 1034 (1996). Accordingly, this "leav[es]

06  interexchange calls outside the reciprocal compensation regime." *Global NAPs I*, 444 at 63;

07  *see also Local Competition Order*, 11 F.C.C.R. at 16013, ¶ 1033 ("The Act preserves the

08  legal distinctions between charges for transport and termination of local traffic and interstate

09  and intrastate charges for terminating long-distance traffic."); *id.* at 16013, ¶ 1035 ("Traffic

10  originating or terminating outside of the applicable local area would be subject to interstate

11  and intrastate access charges.").[1]  Interexchange calls, or non-local calls that terminate

12  *beyond* a local calling area, would continue to utilize the cost recovery mechanism of "access

13  charges," wherein customers are normally billed a per-call distance-based rate by an

14  interexchange ("IXC") carrier or the equivalent thereof, which in turn compensates both the

15  originating and terminating LEC by paying an access charge for the use of each LEC's

16  facilities. *Id.*[2]

17       The FCC's initial implementing regulations of the Act also "left with the state

18  commissions the power to define local calling areas consistent with [their] historical practice

19  of defining local service areas for wireline LECs," as well as the authority to "determine

20  whether intrastate transport and termination of traffic between competing LECs, where a

---

22       [1]  Long-distance calls, often referred to as interstate or intrastate exchange service or
23  toll service, are subject to access charges, not reciprocal compensation. *See* 47 C.F.R. § 69.2.

24       [2]  To further illustrate:  If an ILEC's customer living in Olympia, Washington, calls a
    CLEC customer living in the same local calling area, the ILEC would ordinarily pay the CLEC
25  reciprocal compensation to complete this call; the customer would bear no incremental cost.  If,
    however, the ILEC customer in Olympia calls a CLEC customer in Seattle, *both* the ILEC and
26  the CLEC would receive access charges from the ILEC's customer's IXC, and the customer
    would bear a toll charge.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 3

01  portion of their local service areas are not the same, should be governed by section

02  251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should

03  apply." *Global NAPs I*, 444 F.3d at 63 (internal quotations omitted).

04       Disputes frequently arise between ILECs and CLECs regarding the intercarrier

05  payment mechanism that governs ISP calls. CLECs often argue that calls to ISPs are local

06  calls (or their equivalent), subject to reciprocal compensation payments, because such calls

07  terminate at the ISP's equipment.[3] ILECs, on the other hand, insist that such calls are not

08  subject to the reciprocal compensation regime because they are long-distance interexchange

09  calls that terminate only at the distant computer servers that constitute the world-wide web.

10       Section 252 of the Act prescribes the process by which interconnection agreements are

11  to be formed. 47 U.S.C. § 252. Under this provision, a voluntary agreement between the

12  parties need not conform to every requirement of § 251, and state public utility commissions

13  will review such agreements only for limited purposes. *Id.* § 252(a)(1), (e)(2)(A). Network

14  sharing may take one of three forms: (1) the ILEC and the CLEC may negotiate the terms of

15  an interconnection agreement, § 252(a); (2) they may go through arbitration to establish the

16  terms of an interconnection agreement, § 252(b); or (3) a carrier may adopt an existing

17  interconnection agreement between the incumbent and another telecommunications company,

18  § 252(I). Once the parties have reached an agreement through one of these paths, the Act

19  "entrusts state commissions with the job of approving interconnection agreements." *AT&T*

20  *Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 385 (1999); 47 U.S.C. § 252(e)(1). "[I]f the state

21  public utility commission is asked to resolve open issues by means of compulsory arbitration,

22  47 U.S.C. § 252(b)(1), the Act requires that it 'ensure that such resolution and conditions

23  meet the requirements of section 251 [of the Act], including the regulations prescribed by the

24  [FCC] pursuant to section 251 . . . .'" *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1146 (9th

25

26       [3] Alternatively, CLECs insist that ISP calls do not fit into a "local" or "long distance" model, but instead have a separate compensation regime, to which the FCC's interim compensation regime applies. *See infra*, §§ II.C, VI.A.2.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 4

01  Cir. 2006) (quoting 47 U.S.C. § 252(c)(1).  Any party aggrieved by a state commission's

02  determination "may bring an action in an appropriate Federal district court to determine

03  whether the agreement or statement meets the requirements of section 251."  47 U.S.C. §

04  252(e)(6).

05      B.    The Parties

06      Qwest is Washington's ILEC.  Pac-West and Level 3 are CLECs in the business of

07  serving ISPs that provide dial-up internet callers with access to the internet.  Hundreds of

08  thousands of internet subscribers in Washington who place dial-up internet calls to the ISPs

09  served by Pac-West and Level 3 obtain their local telephone service from Qwest.

10      The WUTC is the state public utility commission responsible for regulating certain

11  utilities in the State of Washington, including telephone service.  R.C.W. § 80.01.040 (2006).

12  In this case, the WUTC also served the role of arbitrating the interconnection agreements

13  between Qwest and Pac-West and Quest and Level 3.  These agreements incorporated the

14  legal requirements, particularly the treatment of intercarrier compensation for ISP-bound

15  traffic, established by the FCC in its *ISP Remand Order*.  This order is of primary importance

16  to the present case.

17      C.    The FCC's *ISP Remand Order*

18      The tortured regulatory tale regarding reciprocal compensation for calls made to ISPs

19  was somewhat clarified by the FCC's April 2001 *ISP Remand Order*, which answered the

20  question of whether such obligations "apply to the delivery of calls from one LEC's end-user

21  customer to an ISP in the same local calling area that is served by a competing LEC."  *ISP

22  Remand Order*, 16 F.C.C.R. at 9159, ¶ 13.  The *ISP Remand Order* made three findings

23  significant to the present case.

24      First, the FCC explained that its prior tendency to classify certain traffic as "local" was

25  improper because that term, "not being a statutorily defined category, is particularly

26  susceptible to varying meanings and, significantly, is not a term used in section 251(b)(5)."

01  *ISP Remand Order*, 16 F.C.C.R. at 9167, ¶ 34; *see also id.* at ¶¶ 45, 54.  For that reason, the

02  FCC avoided reading a "local" limitation into the Act's reciprocal compensation requirement,

03  instead finding that, absent some other statutory limitation, § 251(b)(5) required "reciprocal

04  compensation for transport and termination of *all* telecommunications traffic, – i.e., whenever

05  a local exchange carrier exchanges telecommunications traffic with another carrier." *Id.* at

06  9166, ¶ 32.

07          This "other statutory limitation" came in the form of § 251(g), which constitutes the

08  second major conclusion of the *ISP Remand Order*.  Specifically, the FCC stated that this

09  provision, while "admittedly not transparent," carved out certain modes of traffic from

10  reciprocal compensation requirements, including "exchange access, information access, and

11  exchange services for such access." *Id.*   Accordingly, in a break from its analysis prior to the

12  *ISP Remand Order*, the FCC would now begin with the assumption that *all* traffic was subject

13  to reciprocal compensation unless it fit within § 251(g)'s carve-out.  *See id.* at 9167, ¶ 34

14  ("Because we interpret subsection (g) as a carve-out provision, the focus of our inquiry is on

15  the universe of traffic that falls within subsection (g) and not the universe of traffic that falls

16  within subsection (b)(5).").  Applying this rationale, the FCC concluded that ISP-bound traffic

17  was, at the very least, a subsection (g) "information service" within § 251(g) as "traffic

18  destined for an information service provider." *Id.* at 9171, ¶ 42, 44.  Thus it was traffic not

19  subject to the reciprocal compensation requirements of § 251(b)(5). *Id.* at 9171, ¶ 42.  The

20  same conclusion was made regarding interstate long-distance calls, as the FCC found such

21  calls qualified as "exchange access" under 47 U.S.C. § 153(16).  Further, the FCC determined

22  that, even though § 251(g) did not explicitly address *intra*state exchange access calls, it was

23  "reasonable to interpret" that they too were excluded from § 251(b)(5) "because 'it would be

24  incongruous to conclude that Congress was concerned about the effects of potential

25  disruption to the interstate access charge system, but had no such concerns about the effects

26  on analogous intrastate mechanisms.'" *ISP Remand Order*, 16 F.C.C.R. at 9168 n.66

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 6

01 (quoting *Local Competition Order*, 11 F.C.C.R. at 15869).  The combined effect of findings

02 one and two, then, is that the FCC confirmed its 1999 declaratory ruling that ISP-bound calls

03 are not subject to reciprocal compensation; however, rather than basing this conclusion on the

04 determination that such calls are non-local, it simply "relied on a different statutory section,"

05 which expressly excluded certain forms of traffic (including ISP-bound traffic) from the reach

06 of § 251(b)(5).

07        Third and finally, to satisfy the twin goals of compensating LECs for the cost of

08 delivering ISP-bound traffic and eradicating the ills of "regulatory arbitrage," the *ISP Remand*

09 *Order* created an interim intercarrier regime for "at least some ISP-bound traffic to supplant

10 existing state regimes going forward."  *Global NAPs I*, 444 F.3d at 65; *see also ISP Remand*

11 *Order*, 16 F.C.C.R. at 9187, ¶ 77 (noting that this interim regime "will govern intercarrier

12 compensation for ISP-bound traffic until we have resolved the issues raised in the intercarrier

13 compensation [notice of proposed rulemaking].").  This interim compensation regime was

14 established under the FCC's general authority to regulate the rates and terms of interstate

15 telecommunications services and interconnections between carriers under § 201 of the Act.  It

16 places a declining cap on the rate paid for terminating certain ISP-bound calls and limits the

17 volume of calls eligible for compensation.  *ISP Remand Order*, 16 F.C.C.R. at 9187, ¶ 77; *see*

18 *In re Core Communications, Inc.*, 455 F.3d 267, 273-74 (D.C. Cir. 2006).[4]

19        Simultaneous to the release of the *ISP Remand Order*, the FCC issued a notice of

20 proposed rulemaking ("NPRM") to consider whether it should reconsider all aspects of the

21 intercarrier compensation system for all calls, including ISP-bound calls.  *See In Re*

22 *Developing a Unified Intercarrier Compensation Regime* ("*Intercarrier Compensation*

23 ────────────────

24        [4] More specifically, the interim regime established (1) a gradually declining maximum
rate that one carrier (typically, a CLEC) could charge another carrier (typically, an ILEC) for
25 delivering a call to an ISP; (2) a 10% annual traffic volume growth cap; (3) a requirement that
LECs mirror or charge the same rates for ISP-bound traffic as § 251(b)(5) traffic; and (4) a
26 provision which denies intercarrier compensation for ISP-bound traffic carriers serving in new
markets.  *ISP Remand Order*, 16 F.C.C.R. at 9187, ¶ 77.

01   *NPRM* ”), 16 F.C.C.R. 9610, 2001 WL 455872 (April 27, 2001); *see also In Re Developing a*

02   *Unified Intercarrier Compensation Regime* (“*Intercarrier Compensation FNPRM* ”), 20

03   F.C.C.R. 4685, 2005 WL 495087 (March 3, 2005) (further notice of proposed rulemaking).

04   Meanwhile, the *ISP Remand Order* was appealed to the D.C. Circuit in *WorldCom, Inc. v.*

05   *FCC*, 288 F.3d 429 (D.C. Cir. 2002).  That court rejected the FCC's reasoning that § 251(g)

06   authorized the Commission to carve out all ISP-bound calls from the requirements of §

07   251(b)(5).  *WorldCom, Inc.*, 288 F.3d at 430.  Specifically, the court concluded that § 251(g)

08   was merely a “transitional device” that could not justify the FCC's decision to adopt an

09   entirely new set of regulations governing ISP traffic.  *Id.* at 433.  Nonetheless, in light of the

10   possibility that there were “other legal bases for adopting the rules chosen by the

11   Commission,” the D.C. Circuit did not vacate the *ISP Remand Order* or address any portion

12   of its various interim compensation provisions, but instead remanded the matter to the FCC

13   for further proceedings.  *Id.* at 434.  As a result “the *ISP Remand Order* remains in force.”

14   *Global NAPs*, 427 F.3d at 40 (citing *WorldCom, Inc.*, 288 F.3d at 434; *Verizon Md. Inc. v.*

15   *Global NAPs, Inc.*, 377 F.3d 355, 367 (4th Cir. 2004)).[5]

16         In October 2004, the FCC issued its *Core Forbearance Order*, wherein it chose to

17   forbear from enforcing the growth caps and new market provisions of its *ISP Remand Order*,

18   but leave the other interim rate provisions in place.  *Petition of Core Communications, Inc.*

19   *for Forbearance Under 47 U.S.C. § 160(c) from Application of the ISP Remand Order*

20

21         [5]  During oral arguments in this matter, counsel for Pac-West essentially admitted the
22   same.  *See* Oral Argument Tr. at 59 (noting that D.C. Circuit in *Worldcom*, instead of vacating
      the *ISP Remand Order*, chose “to leave [it] in place”).
23         The CLEC defendants nevertheless contend that Qwest's argument that the *ISP*
24   *Remand Order* must be read to “preserve” access charges is precluded as a matter of law as a
      result of the holding in *WorldCom*.  The Court rejects this contention due to the fact that the
25   *WorldCom* ruling did not vacate any portion of the *ISP Remand Order*, as noted above.  The
      Ninth Circuit's holding in *Pacific Bell v. Pac-West Telecomm., Inc.*, 325 F.3d 1114 (9th Cir.
26   2003), does not change this result, for that case was undisputably limited to intrastate ISP-
      bound traffic *within* a local calling area, unlike the VNXX calls at issue in the present matter.
      *See id.* at 1120, 1130.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 8

01  ("*Core Forbearance Order*"), 19 F.C.C.R. 20179, 2004 WL 2341235 (Oct. 18, 2004).

02      D.    Virtual NXX ("VNXX") Traffic

03      To encourage customers to make internet calls to ISPs, Pac-West and Level 3 offer

04  their subscribers the ability to obtain telephone numbers that are "local" to a geographical area

05  other than the area in which the ISP's modem or other equipment is physically located.  This

06  system allows a customer to call an ISP—a phone call ordinarily subject to toll

07  charges—without having to incur any long distance or toll charges, because the switching

08  equipment treats the call as a local call even though it is not.  An ISP with its equipment in

09  Seattle, for example, might have a telephone number in the "206" area code that would enable

10  Olympia customers in the "360" area code to call the Seattle ISP without dialing the "206"

11  area code and thus without incurring long distance charges.  This method of disguising long

12  distance calls as local calls is accomplished by Qwest though a service called "foreign

13  exchange" or "FX" service.  Pac-West and Level 3 refer to their analogous service as "virtual

14  NXX" or "VNXX" service.

15      Pac-West and Level 3 contend that Qwest unlawfully refused to compensate them for

16  completing calls to these telephone numbers, despite the federally-mandated interim rate

17  regime established by the *ISP Remand Order*.  Qwest, on the other hand, believes that Pac-

18  West and Level 3 utilize the VNXX scheme to avoid paying state-ordered access charges that

19  are required for long-distance calls—a payment regime it contends was unaltered by the *ISP*

20  *Remand Order*.  Furthermore, Qwest asserts that Pac-West and Level 3 are attempting to

21  unlawfully collect compensation from it, despite the fact that it is *Qwest's* networks that are

22  still being used to place the VNXX calls to ISPs.  In that regard, Qwest claims a right to lost

23  toll revenue that resulted from Pac-West and Level 3's use of VNXX numbers.

24      E.    The WUTC's Decisions

25      The proceedings before the WUTC began with the parties' disagreement regarding the

26  terms of their interconnection agreements.  Both CLECs argued that Qwest owed them

01 reciprocal compensation for calls made by Qwest local exchange customers to the dial-up

02 ISPs that are customers of Pac-West and Level 3.  Both interconnection agreements at issue

03 in this case provide for the exchange of ISP-bound traffic at the interim rates established by

04 the *ISP Remand Order*.  Administrative Record ("AR") at 310-12, 829-32; *see also* AR at

05 660, 1046, 1399 n.23.  This incorporation of the *ISP Remand Order* ultimately led to an

06 impasse between the parties, who eventually brought their dispute before the WUTC.

07         In June 2005, Pac-West and Level 3 filed separate petitions with the WUTC for

08 enforcement of their respective interconnection agreements with Qwest, requesting that

09 Qwest be required to pay intercarrier compensation on some or all of the ISP traffic delivered

10 by Qwest.  AR at 4-54, 743-78.  Qwest asserted that it was not required to pay the interim

11 rates established by the *ISP Remand Order* for the VNXX calls Pac-West and Level 3 were

12 terminating to dial-up ISPs because the ISP's modem or server (i.e., its connection to the

13 internet) was not located within the same local calling area as the Qwest customers who were

14 placing the calls.  Qwest insisted that such calls were interexchange calls, unaffected by the

15 *ISP Remand Order*'s interim rate schedule, for which it was entitled to recover payment

16 pursuant to the access charge regime preserved by 47 U.S.C. § 251(g).  In addition, Qwest

17 made several counterclaims against Pac-West and Level 3, including the argument that the

18 method those CLECs were using to facilitate the ISP-bound traffic at issue—VNXX

19 calls—was unlawful and/or not in accordance with the parties' interconnection agreements.

20 *See* AR at 166-69, 910-14.

21         The WUTC granted summary judgment to Pac-West and Level 3 on certain of their

22 claims.  In doing so, the WUTC recognized that resolution of the petitions hinged on its

23 interpretation of the *ISP Remand Order*, which was incorporated into the parties'

24 interconnection agreements.  *See, e.g.*, AR at 657-58.  The WUTC specifically found that

25 nothing in the *ISP Remand Order* or the parties' interconnection agreement limited

26 compensable traffic to ISPs physically located in the same local calling area as the calling

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 10

01 party.  AR at 652, 656-58 1394, 1399-1400.   Furthermore, it interpreted the *ISP Remand*

02 *Order* as creating a separate compensation category "for all ISP-bound traffic, regardless of

03 [the point of] origination and termination of the traffic," in advancement of the "FCC's goal of

04 a uniform intercarrier compensation scheme."  AR at 661, 1405.  Accordingly, the WUTC

05 found that for purposes of determining intercarrier compensation, it was "irrelevant . . .

06 whether the traffic is local, toll, or via VNXX arrangements."  AR at 653.  This interpretation

07 of the *ISP Remand Order* obviated the need to answer the question of how to define the

08 nature of the disputed ISP-bound VNXX traffic for the purposes of intercarrier

09 compensation—i.e., by the physical routing of the call or by the calling/called NPA-NXX

10 numbers.[6]  Because the WUTC found that "all ISP bound traffic" included VNXX traffic,

11 Qwest was found in breach of the parties' interconnection agreement and ordered to pay Pac-

12 West and Level 3 for transport and termination of all ISP-bound traffic originated by Qwest at

13 the FCC's interim rate regimes outlined in the *ISP Remand Order*.

14   In its decisions on reconsideration, the WUTC clarified that preemption was not a

15 basis for its rulings.  AR at 661, 1404.  Specifically, it stated that "[t]he *ISP Remand Order*

16 controls our decision not because of the FCC's preemptive authority, but because the parties

17 have made it controlling by explicitly incorporating the *ISP Remand Order* into their

18 interconnection agreement."  AR at 658.  In addition, the WUTC found that Qwest's claims

19 regarding the use of VNXX were "neither material nor necessary to decide the issue of

20 compensation for ISP-bound VNXX traffic in a petition for enforcement of [the parties']

21 interconnection agreement," and reserved disposition on that issue.  AR at 527, 1274.

22

23   [6] The North American Numbering Plan provides for ten-digit phone numbers, including
a three-digit area code (known as the "numbering plan area" or "NPA"), a three-digit prefix

24 (labeled "NXX"), and a four-digit line number.  NXX codes are assigned for particular central
offices or rate centers, and are associated with specific geographic areas.  Traditionally, all

25 phone numbers with a given NPA-NXX were assigned within the same local calling area,
served out of the same telephone company and office.  Today, however, many LECs permit a

26 subscriber to use a phone number with a *different* NPA-NXX code than would normally be
assigned to that subscriber's premises.  *See supra*, § II.D.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 11

01        On July 10, 2006, Qwest brought the present complaint, which seeks a declaratory

02  judgment that the WUTC's orders misinterpret the *ISP Remand Order*, an injunction

03  preventing enforcement of that interpretation, and payment of the access charges Qwest

04  claims are due and owing under the parties' interconnection agreements.  Qwest's complaint,

05  the parties' numerous pleadings, and the complete record in this case are now before the

06  Court.

07                    III.   JURISDICTION

08        This Court has jurisdiction over Qwest's complaint seeking declaratory and injunctive

09  relief against the WUTC's decision as a misapplication of federal law pursuant to 28 U.S.C. §

10  1331.  *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643-44 (2002)

11  ("[47 U.S.C.] § 252(e)(6) . . . does not *divest* the district courts of their authority under 28

12  U.S.C. § 1331 to review [a] Commission's order for compliance with federal law.").  The

13  Court also has supplemental jurisdiction to review the WUTC's state law determinations,

14  should it choose to do so.  28 U.S.C. § 1367(a), (c).  Venue is likewise proper in this district.

15  28 U.S.C. § 1391(b)(2).   Furthermore, the Court is satisfied that Qwest has standing to

16  invoke the Court's jurisdiction.  Pursuant to 28 U.S.C. § 636(c), the parties have consented to

17  having this matter heard by the undersigned Magistrate Judge.

18                IV.  STANDARD OF REVIEW

19        The posture of this case requires the Court to follow a bifurcated standard of review.

20  As an initial matter, a state agency's interpretation of federal law is not entitled to the

21  deference ordinarily afforded a federal agency's interpretation of its own statutes or

22  regulations under *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.*, 467 U.S.

23  837 (1984).  *See Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1496 (9th Cir. 1997).

24  Accordingly, the standard of review is *de novo*, and the proper measure of review is whether

25  the state regulations and rulings are consistent with federal law.  The Court is not required to

26  defer to the state agency to answer that question.  *Id.* at 1496-97.  Should that review uncover

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 12

01 no illegalities, however, the Court must determine whether the WUTC correctly interpreted

02 the parties' interconnection agreements under the familiar "arbitrary and capricious" standard

03 of review. *U.S. West Commc'ns, Inc. v. Washington Utils. and Transp. Comm'n*, 255 F.3d

04 990, 994 (9th Cir. 2001).

05 V.  ISSUES ON APPEAL

06     This case centers on a dispute over the meaning of the parties' existing interconnection

07 agreements, which incorporate the FCC's *ISP Remand Order* as the standard for determining

08 compensation for ISP-bound traffic.  To that end, the parties agree that this is a case about

09 interpretation, not preemption.  The following issues are presented for review:

10
11     1.    Does the interim compensation regime established by the *ISP Remand
            Order* embrace all ISP-bound traffic, including VNXX traffic?

12     2.    Did the final decisions of the WUTC conflict with the FCC's *ISP
            Remand Order* in this regard, and if so, what is the proper remedy?

13

14 VI.   DISCUSSION

15     A.    <u>The Interim Rate Regime Established by the FCC's *ISP Remand
            Order* Does Not Apply to the ISP-bound VNXX Traffic at Issue</u>

16     <u>in this Case, and the WUTC Erred By Concluding Otherwise</u>

17     Qwest contends that the WUTC erred in interpreting the scope of the *ISP Remand

18 Order*, and as a result, the parties' contract expectations were not met.   Specifically, Qwest

19 insists that the pertinent changes made by the *ISP Remand Order* apply only to ISP-bound

20 traffic originating and terminating in the same local calling area.  It therefore follows,

21 according to Qwest, that the pre-existing "access charge" regime remains intact for ISP calls

22 that terminate in distant local calling areas, such as the VNXX calls at issue in this case.

23     Defendants Pac-West, Level 3, and the WUTC argue that the scope of the *ISP

24 Remand Order* is not so limited.   Instead, they emphasize that the *ISP Remand Order* applies

25 to *all* ISP-bound traffic, does not limit the term "ISP-bound" to calls between a calling party

26 and an ISP server physically located in the same local calling area and, for that matter,

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 13

01  eliminates the terms "local" and "non-local" from the lexicon of intercarrier compensation law.

02  Consequently, the defendants insist that the WUTC properly interpreted the parties'

03  interconnection agreements to require Qwest to compensate Pac-West and Level 3 for

04  terminating all ISP-bound traffic that Qwest originated and delivered to those CLECs, and

05  emphasize that no federal court has found such an interpretation precluded by federal law.

06       The *ISP Remand Order* is not a model of clarity.  Nevertheless, the Court is convinced

07  that the WUTC's interpretation of that order violated federal law and, accordingly, must be

08  reversed.

09

10                1.    *The ISP Remand Order Did Not Eliminate All Distinctions*
                        *Between "Local" and "Interexchange" Traffic*

11       The *ISP Remand Order* did establish that "all telecommunications" are subject to §

12  251(b)(5)'s reciprocal compensation scheme, but the same order, in no uncertain terms,

13  *removed* ISP-bound traffic from that definition.  *See id*. at 9172, ¶ 44 ("ISP-bound traffic . . .

14  is excepted from the scope of 'telecommunications' subject to reciprocal compensation under

15  section 251(b)(5).").  Instead, the FCC determined that such calls are governed by one of two

16  schemes: (1) the interim rate regime established by the *ISP Remand Order*; or (2) the pre-Act

17  access charge regime regulated by state commissions.  Which compensation regime applies

18  depends, in this case, on the breadth of the *ISP Remand Order*, particularly as it pertains to

19  VNXX traffic.  The Court is persuaded that the terms and context of the *ISP Remand Order*,

20  federal circuit decisions interpreting that order, certain policy considerations consistently

21  articulated by the FCC, and basic principles of administrative law counsel against a broad

22  reading of the order.

23       The WUTC's first interpretation error was its apparent reading of the *ISP Remand*

24  *Order* as completely eliminating the distinction between "local" and "non-local" traffic.  The

25  defendants cling to this analysis, arguing that the *ISP Remand Order*'s sweeping rejection of

26  the local/non-local dichotomy is further evidence that the FCC's new compensation scheme

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 14

01  applies to *all* ISP-bound traffic, as discussed in more detail below.  *See, e.g.*, Dkt. No. 28 at

02  19 (Level 3 Brief) (arguing that the FCC "expressly rejected the entire concept of 'local' calls

03  in establishing the analysis contained in the *ISP Remand Order*"); *id.* at 23 (same); Dkt. No.

04  29 at 9 (WUTC Brief) (arguing that the FCC now makes "no distinction between 'local' and

05  'interexchange' ISP-bound traffic").

06          The Court disagrees.  Although the FCC did reevaluate its use of the term "local" in

07  the *ISP Remand Order*, it did not eliminate the distinction between "local" and

08  "interexchange" traffic and the compensation regimes that apply to each—namely, reciprocal

09  compensation and access charges.  *See Global NAPs I*, 444 F.3d at 73.  Indeed, as the First

10  Circuit recently explained, the *ISP Remand Order* itself "reaffirmed the distinction between

11  reciprocal compensation and access charges.  It noted that Congress, in passing the [Act], did

12  not intend to disrupt the pre-[Act] access charge regime, under which 'LECs provided access

13  services . . . in order to connect calls that travel to points—both interstate and

14  intrastate—*beyond the local exchange*.'"  *Id.* (quoting *ISP Remand Order*, 16 F.C.C.R. at

15  9168, ¶ 37) (emphasis added).  Specifically, the *ISP Remand Order* concludes:

16          [U]nless and until the Commission by regulation should determine
        otherwise, Congress preserved the pre-Act regulatory treatment of all the

17      access services enumerated under section 251(g). . . . This analysis properly
        applies to the access services that incumbent LECs provide (either individually

18      or jointly with other local carriers) to connect subscribers with ISPs for
        Internet-bound traffic.

19
20  *ISP Remand Order*, 16 F.C.C.R. at 9168, ¶ 39.

21          Assuming *arguendo* that these distinctions were spurned by the *ISP Remand Order*'s

22  rejection of the term "local," stressing this putative rejection does little to advance the

23  defendants' position in this case.  As explained above, the FCC's *ISP Remand Order* chose

24  not to read a "local" limitation into the Act's reciprocal compensation requirement of §

25  251(b)(5), finding instead that § 251(b)(5) required "reciprocal compensation for transport

26  and termination of *all* telecommunications traffic."  *ISP Remand Order*, 16 F.C.C.R. at 9166,

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 15

01 ¶ 32.  This purported "local" rejection is therefore largely irrelevant in the present case, which

02 deals with ISP-bound traffic—traffic that is unequivocally *excluded* from the dictates of §

03 251(b)(5).  *See id.* at 9172, ¶ 35 ("ISP-bound traffic is not subject to the reciprocal

04 compensation provisions of section 251(b)(5).").  Accordingly, it was error for the WUTC to

05 extend the FCC's disapproval of the "local" descriptor beyond the FCC's intended target—the

06 reciprocal compensation universe of § 251(b)(5).

07          In addition, the defendants argue that it would be inconsistent for the FCC to limit its

08 *ISP Remand Order* to calls delivered to ISPs in the same local calling area on one hand, and

09 outline four distinct compensation regimes on the other.  Such an argument treats these

10 alleged four distinct compensation regimes—i.e., for (1) local calls, (2) toll calls; (3) wireless

11 calls; and (4) ISP-bound calls—as further evidence that ISP-bound traffic does not fit into a

12 "local" or "long distance" model, but rather, has its own unique regime.  *See, e.g.*, Dkt. No.

13 28 at 8, 14-16 (Level 3 Brief).

14          This argument fails for at least three reasons.  First, the *ISP Remand Order*—the only

15 FCC document incorporated into both interconnection agreements—neither outlines nor

16 address the "four categories" to which the defendants refer.[7]  Instead, that categorization

17 appears, if at all, in a "for instance" footnote of the FCC's latest FNPRM.  *See Intercarrier*

18 *Compensation FNPRM*, 20 F.C.C.R. at 4687, ¶ 3 & n.8.[8]  Second, the fact that the FCC may

19

20          [7]  Nor does its holding appear to conflict with such a categorization.

21          [8]  The pertinent text of the *Intercarrier Compensation FNPRM*, and its accompanying

22 footnote, reads as follows:

23                    As a general matter, the record confirms the need to replace the existing
          patchwork of intercarrier compensation rules with a unified approach.  Many
24        commenters observe that the current rules make distinctions based on artificial
          regulatory classifications that cannot be sustained in today's telecommunications
25        marketplace.  Under the current rules, the rate for intercarrier compensation
          depends on three factors: (1) the type of traffic at issue; (2) the types of carriers
26        involved; and (3) the end points of the communication.[FN8]

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 16

01   have envisioned four different compensation regimes for different types of traffic does not

02   mean that the *ISP Remand Order*'s conclusion did not limit its analysis to a subset of one of

03   those types.  Rather, a more appropriate interpretation, in light of federal telecommunications

04   policy and the administrative history of the Act, is that the *ISP Remand Order* addressed the

05   compensation structure of a subset of ISP-bound traffic, specifically, ISP-bound traffic within

06   a local calling area.  *See infra*, § VI.A.2.   The possibility that this footnote could support the

07   proposition that calls to ISPs are neither completely local nor completely long distance does

08   not retroactively broaden the question before the FCC which led to the *ISP Remand Order*.

09   Nor does it eliminate the continuing distinction between local and long distance ISP-bound

10   traffic or remove the authority granted state commissions to determine the same.  *See, e.g.*,

11   *Peevey*, 462 F.3d at 1157-59.  Third, and perhaps most significantly, a reading of the

12   complete text of the FNPRM footnote referenced by Level 3 hardly divorces the ISP-bound

13   calling regime from traditional distinctions between local and interexchange traffic.  Instead,

14   the FCC states only that such calls "are subject to yet another regime," meaning they

15   constitute a different type of traffic than, say, local traffic.  *Intercarrier Compensation*

16   *FNPRM*, 20 F.C.C.R. at 4687, ¶ 3 & n.8.   This does not mean that such traffic lacks

17   attributes of local and/or long-distance traffic.  Indeed, the very footnote quoted by the

18   defendants expressly recognizes "the end points of the communication" as a factor affecting

19   intercarrier compensation, distinguishing, for example, a "long-distance call carried by an

20   IXC" from "a local call carried by two LECs."  *Id.*

21       For those reasons, the Court is unwilling to find that this footnote eliminates all

22

23               FN8.   For instance, a long-distance call carried by an IXC is
24                      subject to a different regime than a local call carried by two
                        LECs. Moreover, CMRS providers and LECs are subject to
25                      different intercarrier compensation rules, and ISP-bound
                        calls are subject to yet another regime.
26

*Intercarrier Compensation FNPRM*, 20 F.C.C.R. at 4687, ¶ 3 & n.8.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 17

01 distinctions between local and interexchange traffic or otherwise overhauls the intercarrier

02 compensation schemes that apply to traffic not addressed by the *ISP Remand Order*. *Accord*

03 *Action for Children's Television v. F.C.C.*, 821 F.2d 741, 745 (D.C. Cir. 1987) ("It is

04 axiomatic that an agency choosing to alter its regulatory course must supply a reasoned

05 analysis indicating that its prior policies and standards are being deliberately changed.")

06 (internal quotations omitted).

07
08
                2.     *The Scope of the ISP Remand Order is Limited to ISP-Bound*
                      *Traffic Within a Single Local Calling Area*

09         In granting partial summary judgment to Pac-West and Level 3, the WUTC interpreted

10 the *ISP Remand Order* broadly, finding that the order was not limited in scope to ISPs

11 physically located in the same local calling area as the calling party.  Moreover, according to

12 the WUTC, the *ISP Remand Order* included VNXX traffic within the definition of  "ISP-

13 bound traffic;" for this reason, the WUTC concluded that for purposes of determining

14 intercarrier compensation under the *ISP Remand Order*'s interim rate regime, it was

15 "irrelevant . . . whether the traffic is local, toll, or via VNXX arrangements."  AR at 653.  The

16 defendants embrace this interpretation, and insist that reading the *ISP Remand Order* to

17 include VNXX traffic does not disturb the pre-Act access charge regime, effectuates

18 important federal regulatory polices, and is supported by recent decisions in the First, Second,

19 Ninth, and D.C. Circuits.

20         The Court agrees that the possible effect of such a reading on the FCC's current

21 intercarrier compensation scheme is an important issue.  However, it is a secondary issue,

22 subordinate to what was *actually decided* by the FCC's *ISP Remand Order*, the terms of

23 which are incorporated into the parties' interconnection agreements.  In this regard, it appears

24 that the WUTC's final decisions and the defendants' arguments have placed the cart before

25 the horse.  VNXX traffic is not mentioned, much less addressed, in the *ISP Remand Order*.

26

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 18

01  *See Global NAPs II*, 454 F.3d at 100-01; *Global NAPs I*, 444 F.3d at 74-75.[9]   This absence is

02  unsurprising in light of the questions that prompted the *Local Competition Order* and *ISP*

03  *Remand Order*.

04          In the *ISP Remand Order*, the question presented to the FCC was decidedly narrow:

05  "whether reciprocal compensation obligations apply to the delivery of calls from one LEC's

06  end-user customer to an ISP *in the same local calling area* that is served by a competing

07  LEC." *ISP Remand Order*, 16 F.C.C.R. at 9159, ¶ 13 (emphasis added).   The scope of the

08  *ISP Remand Order*'s conclusions must therefore be confined to the context of that question.

09  *Accord Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821) (Marshall, C.J.) ("It is a

10  maxim not to be disregarded, that general expressions, in every opinion, are to be taken in

11  connection with the case in which those expressions are used. . . .   The reason of this maxim is

12  obvious.   The question actually before the Court is investigated with care, and considered in

13  its full extent.   Other principles which may serve to illustrate it, are considered in their relation

14  to the case decided, but their possible bearing on all other cases is seldom completely

15  investigated.").

16          It comes as no surprise, then, that every federal court of appeals that has recently

17  analyzed the scope of *ISP Remand Order* in this regard has concluded similarly, i.e., that the

18  changes ushered by that order apply only to ISP-bound traffic within a single local calling

19  area.   *See, e.g.*, *Global NAPs I*, 444 F.3d at 73-74 ("The issue that necessitated FCC action in

20  the . . . *ISP Remand Order* was whether reciprocal compensation obligations apply to the

21  delivery of calls from one LEC's end-user customer to an ISP *in the same local calling area*

22  that is served by a competing LEC.") (internal quotations omitted; emphasis added); *Global*

23  *NAPs II*, 454 F.3d at 99 ("The ultimate conclusion of the [*ISP*] *Remand Order* was that ISP-

24  bound traffic *within a single calling area* is not subject to reciprocal compensation."); *id.*

25  ("Although the [*ISP*] *Remand Order* states explicitly that ISPs are exempt from reciprocal

26

---

        [9]   Defendant Level 3 all but concedes this fact.   *See* Dkt. No. 28 at 9, 21 & n.14.

01  compensation for intra-local calling area calls, it sheds little light on inter-local calling area

02  calls or access fees."); *WorldCom*, 288 F.3d at 430 (explaining that, in the *ISP Remand*

03  *Order*, the FCC "held that under § 251(g) of the Act it was authorized to 'carve out' from §

04  251(b)(5) calls made to [ISPs] located *within the caller's local calling area*") (emphasis

05  added); *Peevey*, 462 F.3d at 1159 (noting that the *ISP Remand Order* "had no effect on" the

06  collection of charges by ILECs for originating interexchange ISP-bound traffic . . . [a]s this

07  issue was not before the FCC when it crafted the *ISP Remand Order*").[10]

08         Indeed, the FCC has itself taken this stance as *amicus curiae*. *See* Brief for Amicus

09  Curiae FCC, *Global NAPs, Inc. v. Verizon New England, Inc.*, 444 F.3d 59 (1st Cir. 2006)

10  (No. 05-2657), 2006 WL 2415737.  In *Global NAPs I*, the First Circuit was confronted with a

11  dispute between Verizon (the ILEC) and Global NAPs (the CLEC) over the applicable

12  payment regime for certain ISP-bound calls made to VNXX numbers.  The CLEC insisted

13  that the VNXX calls at issue were subject to the interim rate regime established by the *ISP*

14  *Remand Order*; the ILEC, however, argued that this regime applied only calls delivered to an

15  ISP in the same local calling area and, because that was not the case, it was entitled to state-

16  ordered access charges.  *Global NAPs I*, 444 F.3d at 61-64.  The court ultimately found that

17  the Massachusetts Department of Telecommunications and Energy (DTE) was free to impose

18  access charges against CLECs for interexchange (or non-local) ISP-bound VNXX traffic.

19  ───────────────────

20         [10]  Because the parties advance markedly different versions of the Ninth Circuit's
    holding in *Peevey*, the Court deems the following clarification appropriate.  In *Peevey*, the
21  Ninth Circuit determined that the *ISP Remand Order* addressed only intercarrier compensation
    for "terminating local ISP-bound traffic," and "d[id] not affect the collection of charges by
22  ILECs for originating interexchange ISP-bound traffic," including VNXX traffic, the
    compensation for which state commissions were free to regulate.  *Peevey*, 462 F.3d at 1159.
23  The holding in *Peevey* allowed the California Public Utilities Commission (CUPC) to treat
    certain VNXX traffic as "local" traffic (i.e., locally rated and billed based on the assignment of
24  telephone numbers) subject to reciprocal compensation, notwithstanding the physical nature of
    its routing.  *Id.* at 1157-58.  Despite coming to similar conclusions regarding the obligations of
25  the respective intercarrier compensation agreements, WUTC's analysis in the present case
    differed from that of the CUPC in *Peevey*, as will be discussed in more detail below.  *See infra*,
26  § VI.B.

01 │ *Global NAPs I*, 444 F.3d at 73-76.  This conclusion was reached after determining that the

02 │ *ISP Remand Order* (1) did not eliminate the distinction between local and interexchange

03 │ traffic and their corresponding compensation regimes; (2) applied only to local ISP-bound

04 │ traffic within the same local calling area; and (3) made "no express statement that ISP-bound

05 │ traffic is not subject to access charges."  *Id.*  Prior to so ruling, however, the First Circuit

06 │ invited the FCC to file an *amicus* brief addressing the scope of the *ISP Remand Order*,

07 │ whether that order preempted state regulation of interstate access charge schemes, and the

08 │ applicable standard of review.  *Id.* at 74-75; Brief for Amicus Curiae FCC, *Global NAPs I*,

09 │ 2006 WL 2415737 at *2-3.

10 │       Although the FCC's brief highlighted the ambiguity of the *ISP Remand Order*'s

11 │ preemption analysis, it repeatedly emphasized the narrow scope of the order, mirroring the

12 │ above-mentioned analyses of the First, Second, Ninth, and D.C. Circuits.  Ultimately, the FCC

13 │ as *amicus curiae* concluded that "the administrative history that led up to the *ISP Remand*

14 │ *Order* indicates that in addressing compensation, the Commission was focused on calls

15 │ between dial-up users and ISPs in a single local calling area."  Brief for Amicus Curiae FCC,

16 │ *Global NAPs I*, 2006 WL 2415737 at *12.  Strongly controverting the current defendants'

17 │ argument that this limitation (recited, for example, in paragraph 13 of the *ISP Remand Order*)

18 │ was merely a "background" summary of a bygone era in intercarrier compensation, the FCC

19 │ unequivocally explained that the aforementioned "administrative history *does not indicate* that

20 │ the Commission's focus broadened on remand."  *Id.*  (emphasis added).  The FCC's *amicus*

21 │ brief concluded as follows:

22 │       [T]he [*ISP Remand O*]*rder* . . . indicates that, in establishing the new
   │ compensation scheme for ISP-bound calls, the Commission was considering
23 │ only calls placed to ISPs located in the same local calling area as the caller.
   │ The Commission itself has not addressed application of the *ISP Remand Order*
24 │ to ISP-bound calls outside a local calling area.  Nor has the Commission
   │ decided the implications of using VNXX numbers for intercarrier
25 │ compensation more generally.

26 │ *Id.* at *10-11.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 21

01      The parties to the present case recognize the FCC's *amicus curiae* position.  The

02  defendants, however, insist that it should be given no weight.

03      The Court disagrees.  First, the FCC's *amicus* brief was filed at the request of the First

04  Circuit, not by the FCC or its commissioner as a party to a pending case.  Second, while the

05  brief does not carry the force of law, *Christensen v. Harris County*, 529 U.S. 576, 587

06  (2000), it is serves as a probative interpretation of an ambiguous FCC order and, for that

07  reason, should be given substantial weight unless "plainly erroneous or inconsistent" with the

08  applicable order.  *Cf. Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Bassiri v. Xerox*

09  *Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) ("[W]here an agency interprets its own regulation,

10  even if through an informal process, its interpretation of an ambiguous regulation is

11  controlling under *Auer* unless plainly erroneous or inconsistent with the regulation.") (internal

12  quotations omitted).[11]  Similar to *Auer*, the fact that this interpretation comes via a legal brief

13  "does not, in the circumstances of this case, make it unworthy of deference.  The [FCC's]

14  position is in no sense a *post hoc* rationalizatio[n] advanced by an agency seeking to defend

15  past agency action against attack," and "[t]here is no simply no reason to suspect that the

16  interpretation does not reflect the agency's fair and considered judgment on the matter in

17  question."  *Id.* at 462 (internal quotations omitted); *see also Dreiling v. American Exp. Co.*,

18  458 F.3d 942, 953 n.11 (9th Cir. 2006) ("This principle [from *Auer*] applies even if the

19  [agency's] interpretation is presented in the form of an amicus brief.").  Moreover, the FCC's

20  *amicus curiae* brief addressed an issue at the center of the present dispute, and the fact that it

21  was filed outside the Ninth Circuit does not detract from its probative value, for it is fair to

22  say that the FCC's analysis of this issue is unlikely to vacillate by jurisdiction.

23  _____

24      [11] *Auer*-type deference, not *Skidmore* deference, is more appropriate here, as the FCC's
*amicus* brief addressed its own regulations and orders, not the terms of a governing statute.

25  *Compare Auer*, 519 U.S. at 461, *with Christensen v. Harris County*, 529 U.S. 576, 587 (2000)
(noting that under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), an agency's statutory

26  interpretation not reached through the normal notice-and-comment procedure lacks the force of
law and is not entitled to *Chevron* deference).

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 22

01    In sum, while the FCC has actively considered the question of whether "Internet

02  telecommunications traffic is subject to reciprocal compensation[,] it has never directly

03  addressed the issue of ISP-bound calls that cross local-exchange areas." *Global NAPs II*, 454

04  F.3d at 95.  This includes the VNXX traffic at issue in the present dispute, unless and until the

05  WUTC categorizes it as (or comparable to) "local calling area" ISP-bound traffic subject to

06  the FCC's interim rate regime.  By skipping this analysis and instead interpreting the *ISP*

07  *Remand Order* to encompass *all* ISP-bound traffic, including VNXX traffic *outside* a local

08  calling area, the WUTC violated federal law.

09

10              3.   *The WUTC's Final Decisions Undermine the Policy*
                      *Concerns Underlying the FCC's ISP Remand Order*

11    Not only do the WUTC's final decisions misinterpret the *ISP Remand Order*, they

12  seriously undermine the policy concerns which led to that order.  Specifically "[i]n issuing the

13  *ISP Remand Order* and setting forth the interim federal intercarrier compensation regime, the

14  FCC was focused on limiting the problem of regulatory arbitrage." *Global NAPs I*, 444 F.3d

15  at 74; *see also ISP Remand Order*, 16 F.C.C.R. at 9187, ¶ 77 (noting that the interim regime

16  is designed to "address market distortions under the current intercarrier compensation regime

17  for ISP-bound traffic" and "serves to limit, if not end, the opportunity for regulatory

18  arbitrage"); *id.* at 9190, ¶¶ 83, 74 (explaining the FCC's goal that LECs should "formulate

19  business plans that reflect decreased reliance on revenues from intercarrier compensation,"

20  and "look to their ISP customers, rather than to other carriers, for cost recovery").  By

21  invoking the term "regulatory arbitrage," the FCC's was referring to the concern that high,

22  one-directional traffic to ISPs allowed CLECs to terminate approximately eighteen to forty

23  times more traffic than they originated, creating significant traffic imbalances and a $2 billion

24  annual windfall from ILECs through reciprocal compensation on calls to locally situated ISPs.

25  *See, e.g.*, *id.* at 9154, ¶ 6, 9183, ¶ 70.

26    Therefore, interpreting the *ISP Remand Order* narrowly—e.g., as not addressing

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 23

01   VNXX traffic, and as leaving intact the access charge system for interexchange ISP-bound

02   traffic—makes sense as a policy matter because the opposite approach, urged by the

03   defendants, would likely *reverse* the direction in which payment for this traffic is ordinarily

04   made. The defendants' approach "would create new opportunities for regulatory arbitrage, by

05   requiring [Qwest] to pay compensation on all calls to ISPs, including . . . calls to ISPs . . . for

06   which [it] had previously *received* compensation under established rules." *Global NAPs I*,

07   444 F.3d at 74 n.15 (internal quotations omitted). This flies in the face of the policy concerns

08   articulated in the *ISP Remand Order*, and lends further support to the conclusion that the *ISP*

09   *Remand Order* did not address compensation for interexchange ISP-bound traffic, such as the

10   VNXX calls at issue in this case.

11         This is not to say that recent FCC orders, such as its companion *NPRM*s or *Core*

12   *Forbearance Order*, do not highlight other, perhaps even conflicting, policy concerns, such as

13   the need for a uniform compensation system and increased internet availability. *See Core*

14   *Forbearance Order*, 19 F.C.C.R. at 20186, ¶ 21 (suggesting the need for uniformity as a

15   reason for terminating the *ISP Remand Order*'s "new markets" restriction); *but see id.* at

16   20186, ¶¶ 18-19 (stressing that "the rate caps and mirroring rule remain necessary to prevent

17   regulatory arbitrage and promote efficient investment in telecommunications services and

18   facilities"). Moreover, there is no doubt that the VNXX traffic at issue in this case has

19   significant policy and economical implications for exchange carriers that have yet to be fully

20   and fairly addressed. It may be true, for example, that the physical location of an ISP is a

21   poor regulatory reference point when it comes to determining intercarrier compensation for

22   this traffic. ISP-bound VNXX traffic significantly alters one of the fundamental assumptions

23   upon which the Act and its implementing regulations were based—i.e., the traditional

24   distinction between local service and long-distance service, and the two separate

25   compensation schemes attending to each. The *ISP Remand Order* modified this longstanding

26   system as it relates to telecommunications traffic and ISP-bound calls within a local calling

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 24

01 | area. Today's technology may render the traditional distinctions less meaningful or even

02 | obsolete, and it may also be true that the FCC's compensation regime has yet to fully catch-up

03 | with the technology. However, this Court, lacking the specialized expertise, is disinclined to

04 | fill in the blanks in this regard, and rejects the defendants' suggestion that the FCC, in its *ISP*

05 | *Remand Order*, would have endorsed such a fundamental across-the-board change in

06 | intercarrier compensation without mentioning it was doing so.

07 | Concluding otherwise would require the Court to ignore a fundamental tenet of

08 | administrative law—i.e., that an agency cannot silently alter its regulatory course, but rather

09 | must provide a reasoned basis for doing so. *See, e.g.*, *Action for Children's Television v.*

10 | *F.C.C.*, 821 F.2d 741, 745 (D.C. Cir. 1987) ("It is axiomatic that an agency choosing to alter

11 | its regulatory course 'must supply a reasoned analysis indicating that its prior policies and

12 | standards are being deliberately changed, not casually ignored.'") (quoting *Greater Boston*

13 | *Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). Furthermore, if the agency

14 | fails to supply a basis for its action, this Court is not allowed to fill that void. *Motor Vehicle*

15 | *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Hells Canyon*

16 | *Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1182 (9th Cir. 2000).

17 | B.   Remanding to the WUTC is the Appropriate Remedy in this Case

18 | The posture of this case puts the defendants in a difficult position because while the

19 | WUTC likely had the authority to require interim rate regime compensation for VNXX traffic,

20 | the route it chose to arrive at that conclusion violated federal law. Ironically, the WUTC

21 | interpreted the *ISP Remand Order* so broadly that it actually *rejected* Pac-West's argument

22 | that the order requires ISP compensation to be paid only on traffic from telephone numbers

23 | assigned to the same local calling area. *See* Dkt. No. 27 at 19 (Pac-West Brief).[12]   Because

24 | the *ISP Remand Order* does not require Qwest to pay intercarrier compensation on calls

25 |

26 |        [12]  Of course, Pac-West's wrinkle on this "local calling area" is that it would be determined by the assignment of a certain calling and called NPA-NXX number, not by the physical routing of the call. For a similar approach, see *Peevey*, 462 F.3d at 1157-59.

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 25

01  placed to ISPs located outside the caller's local calling area—such as VNXX calls (unless the

02  WUTC decides to define this traffic as within a local calling area)—Qwest is not, under the

03  WUTC's present analysis, contractually obligated to pay Pac-West or Level 3 the interim

04  compensation rates established by the FCC.

05  However, the holding of this Court is limited.  By reversing and remanding this case,

06  the Court does not hold that the WUTC lacks the authority to interpret the parties'

07  interconnection agreements to require interim rate cap compensation to Pac-West and Level 3

08  for the ISP-bound VNXX calls at issue.  On remand, the WUTC is simply directed to

09  reinterpret the *ISP Remand Order* as applied to the parties' interconnection agreements, and

10  classify the instant VNXX calls, for compensation purposes, as within *or* outside a local

11  calling area, to be determined by the assigned telephone numbers, the physical routing points

12  of the calls, or any other chosen method within the WUTC's discretion.  It is plausible that the

13  ultimate conclusion reached by the WUTC will not change.  *See, e.g.*, *Peevey*, 462 F.3d at

14  1157-59; *Pacific Bell*, 325 F.3d at 1130.  However, the method by which that conclusion will

15  be reached must not contravene federal telecommunications law and policy.  *Accord AT & T*

16  *Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 378 n.6 (1999) ("[T]here is no doubt . . . that if the

17  federal courts believe a state commission is not regulating in accordance with federal policy[,]

18  they may bring it to heel.").

19  VII.    CONCLUSION

20  For the foregoing reasons, the final decisions of the WUTC are REVERSED and

21  REMANDED for further proceedings not inconsistent with this Order.

22  DATED this 9th day of April, 2007.

23

24  JAMES P. DONOHUE

25  United States Magistrate Judge

26

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 26

01
02
03
04
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

ORDER REVERSING AND REMANDING
THE FINAL DECISIONS OF THE WUTC
PAGE - 27